**United States District Court**
**Middle District of Florida**
**Orlando Division**

GLENN AUSTIN ROBINSON,

**Plaintiff,**

-vs-                                                  **Case No. 6:11-cv-249-Orl-31KRS**

COMMISSIONER OF SOCIAL
SECURITY,

**Defendant.**
_____

**REPORT AND RECOMMENDATION**

TO THE UNITED STATES DISTRICT COURT:

This cause came on for consideration without oral argument on the Complaint filed by Glenn

Austin Robinson, seeking review of the final decision of the Commissioner of Social Security

denying his claim for social security benefits. Doc. No. 1. The Commissioner answered the

Complaint and filed a certified copy of the record before the Social Security Administration (SSA).

Doc. Nos. 11-12.

**I.     PROCEDURAL  HISTORY.**

In July 2006, Robinson applied for disability benefits under the Federal Old Age, Survivors

and Disability Insurance Programs (OASDI), 42 U.S.C. § 401 *et seq*., and under the Supplemental

Security Income for the Aged, Blind and Disabled Program (SSI), 42 U.S.C. § 1381, *et seq*.

(sometimes referred to herein as the Act). R. 78-80, 458-65. He alleged that he became disabled on

March 31, 2004.  R. 78, 458.  Robinson's applications were denied initially and on reconsideration.

R. 57-59, 68-71, 466-75.

Robinson requested a hearing before an administrative law judge (ALJ).  R. 56.  An ALJ held

a hearing on January 12, 2009.  Robinson, represented by an attorney, testified at the hearing.

Jackson McKay, a vocational expert (VE), also testified.  R. 518-45.

After considering the testimony and the medical evidence presented, the ALJ determined that

Robinson was insured under OASDI through December 31, 2009.  R. 22.  The ALJ found that

Robinson had not engaged in substantial gainful activity since March 31, 2004, the alleged onset date

of his disability.  *Id.*

The ALJ concluded that the medical evidence showed that Robinson had the following severe

impairments:  bipolar disorder, depressive disorder, hyperthyroid, lumbrosacral strain, herniated

lumbar discs, gastroesophageal reflux disorder (GERD), and history of Lyme's disease.  R. 22.  The

ALJ concluded that Robinson had mild limitations in activities of daily living and social functioning,

and moderate limitations in concentration, persistence or pace, with no episodes of decompensation.

R. 24.  These impairments did not meet or equal any of the impairments listed in the applicable social

security regulations (the Listings).  R. 23.

The ALJ found that Robinson had the residual functional capacity (RFC) to perform light

work,[1] with occasional bending, stooping, crouching kneeling and reaching above shoulder, no

---

[1] Light work involves "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls."  20 C.F.R. §§

crawling or use of foot controls, and avoiding hazardous machinery and unprotected heights.

Robinson would also be limited to low stress work and must not have contact with the public unless

brief and superficial. R. 26. The ALJ explained that the mental functional limitation was "given in

consideration of reasonable limitations imposed by his severe depression and bipolar disorder . . .

[and] gives the claimant the most benefit of the doubt considering his problems with credibility that

include his inadequate compliance with treatment and recommendations." R. 33.

In reaching this conclusion, the ALJ gave great weight to the opinions of the reviewing

physicians. The ALJ considered the opinions of the treating doctors, but did not give weight to the

opinions that included global assessment of functioning (GAF) scores of 40-45 because the record

showed that Robinson's functional ability was higher when he was compliant with medication. R.

33.[2]

The ALJ concluded that Robinson could not return to his past relevant work. R. 34. Relying

on the testimony of the VE, and considering the Medical-Vocational Guidelines, 20 C.F.R. Pt. 404,

Subpt. P, App. 2, the ALJ concluded that Robinson could work as a mail clerk, photo finisher or

service system monitor, all of which are unskilled, light or sedentary jobs. R. 36. Therefore, the ALJ

concluded that Robinson was not disabled. R. 37.

---

404.1567, 416.967.

[2] The Global Assessment of Functioning (GAF) scale ranges from 100 (superior functioning) to 1 (persistent danger of severely hurting self or others, or unable to care for himself). *Harold I. Kaplan, M.D. & Benjamin J. Sadock, M.D., Synopsis of Psychiatry* 299 (8th Ed. 1998) (hereinafter *Synopsis of Psychiatry*).

Robinson requested review of the ALJ's decision supported by additional evidence.  R. 9, 12.

On December 28, 2010, the Appeals Council issued a decision after review of the new evidence

finding no basis to review the ALJ's decision.  R. 6-8.  Robinson timely sought review of this

decision by this Court.  Doc. No. 1.

## II.     JURISDICTION.

Plaintiff having exhausted his administrative remedies, the Court has jurisdiction to review

the decision of the Commissioner pursuant to 42 U.S.C. § 405(g), as adopted by reference in 42

U.S.C. § 1383(c)(3).

## III.    STANDARD OF REVIEW.

To be entitled to disability benefits under OASDI or SSI, a claimant must be unable to engage

in any substantial gainful activity by reason of any medically determinable physical or mental

impairment which has lasted or can be expected to last for a continuous period of not less than twelve

months.  42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).  A "physical or mental impairment" under the

terms of the Act is one "that results from anatomical, physiological, or psychological abnormalities

which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques."  42

U.S.C. §§ 423(d)(3), 1382c(a)(3)(D).  In a case seeking disability benefits under OASDI, the claimant

also must show that he or she became disabled before his or her insured status expired in order to be

entitled to disability benefits.  42 U.S.C. § 423(c)(1); *Demandre v. Califano*, 591 F.2d 1088, 1090

(5th Cir. 1979) (per curiam).

Pursuant to 42 U.S.C. § 405(a), the SSA has promulgated a five-step inquiry that must be

followed in determining whether a claimant is entitled to benefits.  In sum, an ALJ must apply the

following criteria, in sequence:

(1)     Is the claimant presently unemployed?

(2)     Is the claimant's impairment severe?

(3)     Does the claimant's impairment meet or equal one of the specific impairments set forth in 20 C.F.R. Part 404, Subpart P, Appendix 1?

(4)     Is the claimant unable to perform his or her former occupation?

(5)     Is the claimant unable to perform any other work within the economy?

20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).  An affirmative answer to any of the above questions leads to either the next question, or, on steps three and five, to a finding of disability.  A negative answer leads to a finding of "not disabled."  *See, e.g.*, *McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1986).

"The burden is primarily on the claimant to prove that he is disabled, and therefore entitled to receive Social Security disability benefits."  *Doughty v. Apfel*, 245 F.3d 1274, 1278 (11th Cir. 2001) (citing 20 C.F.R. § 404.1512(a)).  However, "the burden temporarily shifts at step five to the Commissioner[,] . . . [who] must produce evidence that there is other work available in significant numbers in the national economy that the claimant has the capacity to perform."  *Id.* at 1278 n.2 (citing *Jones v. Apfel*, 190 F.3d 1224, 1228 (11th Cir. 1999)).

A court's review of a final decision by the SSA is limited to determining whether the ALJ's factual findings are supported by substantial evidence, *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005) (per curiam), and whether the ALJ applied the correct legal standards, *Lamb v. Bowen*, 847 F.2d 698, 701 (11th Cir. 1988).

The SSA's findings of fact are conclusive if supported by substantial evidence.  42 U.S.C. § 405(g); *Dyer*, 395 F.3d at 1210.  "Substantial evidence is more than a scintilla, and must do more

than create a suspicion of the existence of the fact to be established.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Walden v. Schweiker*, 672 F.2d 835, 838-39 (11th Cir. 1982) (internal quotations omitted).

The court "must view the record as a whole, taking into account evidence favorable as well as unfavorable to the [SSA's] decision."  *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986) (per curiam) (citing *Tieniber v. Heckler*, 720 F.2d 1251, 1253 (11th Cir. 1983)).  Where the SSA's decision is supported by substantial evidence, the court will affirm, even if the court finds that the proof preponderates against the decision.  *Dyer*, 395 F.3d at 1210.  The court may not reweigh the evidence or substitute its own judgment.  *Id*.

While there is a presumption in favor of the SSA's findings of fact, no such presumption attaches to the ALJ's legal conclusion about the proper standards to be applied in evaluating claims. *Welch v. Bowen*, 854 F.2d 436, 438 (11th Cir. 1988) (per curiam).  Therefore, the court will reverse if the SSA incorrectly applied the law, or if the decision fails to provide the court with sufficient reasoning to determine that the SSA properly applied the law.  *Keeton v. Dep't of Health & Human Serv's*, 21 F.3d 1064, 1066 (11th Cir. 1994) (citing *Cornelius v. Sullivan*, 936 F.2d 1143, 1145 (11th Cir. 1991)).

When reviewing a final decision issued by the SSA, the court is authorized to "enter . . . a judgment affirming, modifying, or reversing the decision . . . with or without remanding the cause for a rehearing."  42 U.S.C. § 405(g).

## IV.    STATEMENT OF FACTS.

After a thorough review of the record, I find that the pertinent facts are generally adequately presented in the opinion of the ALJ and the parties' memoranda. Therefore, I will only summarize the evidence to protect Robinson's privacy to the extent possible.

### A.    Personal Information and Work History.

Robinson was born in 1964. He completed the ninth grade in school and subsequently obtained his GED. R. 521. He previously worked as a tool repairer. R. 522. The VE testified that this was a skilled job requiring a medium level of exertion. R. 541. Robinson stopped working in March 2004 because he could no longer handle the customers and he felt overwhelmed. R. 522.

### B.    Medical Records.

In December 2001, Robinson was treated at Brookhaven hospital after he attempted suicide by lying down on railroad tracks. R. 127, 147. He reported a history of depression and that he took a variety of medication. R. 123. Choong Cho, M.D., observed that Robinson was depressed, fearful, anxious, irritable and angry with disorganized, racing thoughts. Robinson indicated that he did not like being around people. R. 124. Dr. Cho's impression was that Robinson had a major depressive disorder recurrent, with possible bipolar II disorder and a personality disorder not otherwise specified (NOS). His GAF score on admission was 20.[3]  R. 125.

In the discharge summary, Dr. Cho found that Robinson had a bipolar II disorder, most recent, depressed, a personality disorder NOS, with a GAF score of 55.[4]  Robinson had been taking

---

[3]  A score of 11 to 20 reflects "[s]ome danger of hurting self or others" among other things. *Synopsis of Psychiatry* at 299.

[4]  A GAF score of 51 to 60 reflects "[m]oderate symptoms (eg, flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (eg, few friends, conflicts with peers or coworkers)." *Synopsis of Psychiatry* at

medication, including Zyprexa, Depakote, Wellbutrin, and Zoloft, but not participating in group activities. R. 117-18. His thought processes were more organized. However, Dr. Cho noted that his prognosis was guarded. *Id.* Thereafter, Robinson was treated at a Suffolk County mental health agency. R. 254-59.

Robinson was admitted to Brookhaven again in January 2002 due to suicidal thoughts. R. 150-56. The initial diagnosis was major depressive disorder recurrent. R. 164.

Robinson was admitted to Brookhaven in March 2002 because he was expressing suicidal ideation. Dr. Cho's final diagnosis was the same as previously. R. 168. After his medication was adjusted, Robinson's condition improved. Dr. Cho's assessment was that Robinson had a GAF score of 20 at admission and 55 at discharge. R. 168-69. Following discharge, Robinson continued treatment at the Suffolk County mental health agency. R. 252-53.

In October 2003, Robinson was admitted to Mather Hospital following an overdose on antifreeze to "'get attention.'" R. 200. Piotr Olkowski, M.D., observed that Robinson was anxious, with a restricted affect and depressed mood. He had deficits in recent memory and poor attention. The diagnosis was bipolar disorder, depressed type. R. 200. His GAF score was 25. He was treated with Seroquel, Ambien, Concerta and Depakote. R. 201.

On October 20, 2003, Paul Fritz, M.D., observed that Robinson's affect was blunted and dysthymic with a constricted range. His insight and judgment were impaired. He had participated to

---

299.

a certain extent in ward treatment activities. He was discharged with medication with a GAF of 40.[5]

R. 224-26. Thereafter, he was again treated at the Suffolk County mental health agency. R. 249-50.

On January 25, 2005, Robinson sought treatment for knee pain after his knee popped out. R.

291. A knee brace was authorized. R. 286.

In April 2005, Robinson complained of increased GERD and lumbar back pain. Prevacid and

Celebrex were prescribed and the dosage of Depakote was adjusted. He also requested medication to

help him sleep. R. 277.

In early 2006, Robinson reported that he felt anxious dealing with people. R. 271. Robinson

again sought treatment from the Suffolk County mental health agency in April 2006. The assessment

was a GAF score of 56. R. 244. He was treated with Zoloft, Seroquel, Ambien and Prozac. R. 270.

In July 2006, Robinson went to an emergency room in Florida for refills of his medication.

Robinson indicated that he was not taking his medication. He believed Depakote made him sleepy.

Gary Morrison, M.D., indicated that Robinson did not appear to be depressed. R. 261.

On August 14, 2006, Robinson sought to establish himself as a patient with Amy Freeman,

PA-C, and Dina Doolin, D.O. The report notes a history of severe depression and bipolar disorder

but no manifestations of those conditions were noted by the examining professionals. R. 315-16.

On September 20, 2006, Malcolm J. Graham, III, Ph.D., examined Robinson at the request of

the SSA. Robinson reported that he had recently moved to Florida from New York. R. 294. He was

taking Depakote, Seroquel, Zoloft, Levothoxin, Ambien and Prevacid. R. 295. The medication

helped significantly. He reported spending his day playing cards, going to the beach, pool or sauna

---

[5] A GAF score of 31 to 40 reflects "[s]ome impairment in reality testing or communication (eg, speech is at times illogical, obscure, or irrelevant) OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (eg, depressed man avoids friends, neglects family, and is unable to work . . .)." *Synopsis of Psychiatry* at 299.

and watching movies. Results of mental status testing were normal. Dr. Graham's impression was that Robinson had a major depressive disorder, recurrent, mild to moderate by report with a GAF score for the previous year of 70-75.[6] R. 295-96.

On September 28, 2006, Steven Wise, Psy.D., prepared a mental RFC assessment after review of Robinson's records. He opined that Robinson had mild limitations in activities of daily living, social functioning and concentration, persistence or pace with no episodes of decompensation. R. 308.

In November 2006, Robinson was evaluated at ACT Corporation (ACT). The initial evaluator, whose name is illegible, noted that Robinson reported that he was stable and sleeping well. The examiner indicated that Robinson's GAF score was 45.[7] R. 331. A professional who examined Robinson in January 2007 observed that his attention was good and his concentration fair, with a moderately depressed mood. His insight and judgment were good. Medication was adjusted. R. 325. In a follow-up visit in February, the examiner noted that Robinson had poor motivation and that his mother was overly protective. His mother reported that Robinson had some depressive swings. The examiner observed that Robinson had fair attention and concentration, anhedonia, and limited insight with fair judgment, with a GAF score of 50. R. 324.

Robinson established care at the Bert Fish Medical Center in March 2007. He needed refills of medication. R. 380. He reported having symptoms of depression. R. 381. During a visit to ACT

---

[6] A GAF score of 71 to 80 reflects that "[i]f symptoms are present, they are transient and expectable reactions to psychosocial stressors (eg, difficulty concentrating after family argument); no more than slight impairment in social, occupational, or school functioning (eg, temporarily falling behind in schoolwork)." *Synopsis of Psychiatry* at 299.

[7] A GAF score of 41 to 50 reflects "[s]erious symptoms (eg., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (eg, no friends, unable to keep a job)." *Synopsis of Psychiatry* at 299.

in April 2007, Robinson stated that he had been doing great until he had to wait to see the examiner. His impulse control was limited and his insight and judgment fair with a GAF score of 55. R. 323. In June 2007, Robinson indicated that he was "doing pretty good" and that his medications were working. His GAF score was 55. R. 322.

On July 2, 2007, Charles E. Kollmer, M.D., examined Robinson for complaints of back pain. Robinson indicated that he was an active person who used work-out machines at the gym. He experienced pain when lifting weights and doing leg presses. R. 336. Upon examination, Dr. Kollmer noted tenderness and paraspinal muscle spasm. The diagnosis was lumbosacral strain. R. 332. Subsequent x-rays showed mild degenerative changes in the lumbosacral spine. Dr. Kollmer treated Robinson with medication and injections. R. 332.

Robinson underwent a course of physical therapy to address his back pain in August 2007. R. 365-66, 369-74. Upon discharge, Robinson reported 90% improvement. R. 365.

ARNP Emerson treated Robinson on August 23, 2007. Robinson had broken up with his girlfriend. He indicated that when things did not go his way he felt like "ending it." R. 436. He had reduced his use of Seroquel and tried not to take Ambien. Emerson observed that his attention, concentration, memory, insight and judgment were fair. His GAF score was 50. *Id.*

On August 31, 2007, Alan Harris, Ph.D., prepared a mental RFC assessment after review of Robinson's records. Dr. Harris opined that Robinson had mild limitations in activities of daily living and social functioning, and moderate limitations in concentration, persistence or pace with no episodes of decompensation. R. 345-58. Dr. Harris indicated that Robinson would be moderately limited in the ability to do the following: maintain attention and concentration for extended periods; perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances; complete a normal workday and workweek without interruptions from psychologically

based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods; and, set realistic goals or make plans independently of others. R. 359-60. In his notes, Dr. Harris indicated that during mood swings, Robinson would have difficulty maintaining concentration, persistence and pace (CPP) for extended tasks. R. 361.

On October 8, 2007, Nicolas Bancks, M.D., prepared a physical RFC assessment after review of Robinson's records. He opined that Robinson could lift up to 50 pounds occasionally and 25 pounds frequently. He could sit, stand or walk about 6 hours in an 8-hour workday. R. 383. He could only occasionally climb ladder/rope/scaffolds, balance, stoop, and crouch. R. 384. He had a limited ability to reach, including overhead. R. 385. He should avoid concentrated exposure to extreme cold and heat and hazards. R. 386.

ARNP Emerson saw Robinson again on October 16, 2007. He reported that he was doing fair, but he was angry because he was not the first patient seen. Emerson noted that Robinson's attention, concentration, memory, impulse control, insight and judgment were fair. She adjusted his medication. His GAF score was 45. R. 435.

On November 1, 2007, Robinson told ARNP Emerson that he had been crying all the time and unable to manage stress. He reported that his best friend died earlier in the week. Emerson noted that his mood was very sad and his insight and judgment were limited. She assessed his GAF score as 40. R. 434. On November 15, 2007, Robinson told Emerson that he was still crying, depressed and unable to manage stress. He brought a disability form for Emerson to complete. She assessed his GAF score as 40. R. 433.

On November 15, 2007, ARNP Emerson completed a mental RFC questionnaire in which she indicated that she had seen Robinson every two months for one year. Emerson wrote that Robinson was still profoundly depressed. She indicated that he was "immobilized without presence of family

(who are burned out), depressed, crying, and becomes volatile and out of control at least stress eg having to wait to be seen." R. 390. His prognosis was fair to guarded. *Id.* Emerson indicated that Robinson was seriously limited in the following abilities: remember work-like procedures; understand, remember and carry out very short and simple instructions; sustain an ordinary routine without special supervision; ask simple questions or request assistance; and, adhere to basic standards of neatness and cleanliness. She indicated that Robinson was unable to meet competitive standards in the following areas: maintain attention for two hour segment; make simple work-related decisions; perform at a consistent pace without an unreasonable number and length of rest periods; understand, remember and carry out detailed instructions; set realistic goals or make plans independently of others; deal with stress; and, maintain socially appropriate behavior. R. 391-93. She rated his limitations as marked in activities of daily living and concentration, persistence or pace and extreme in maintaining social functioning with four or more repeated episodes of decompensation within a 12 month period. R. 393. She opined that Robinson would be absent from work more than 4 days a month. R. 394.[8] On January 1, 2009, Robert Deeb, M.D., indicated that he agreed with Emerson's assessment. R. 451. It is not clear from the records whether or when Dr. Deeb examined Robinson.

On December 11, 2007, Robinson's condition had improved, although ARNP Emerson noted that his impulse control, insight and judgment were poor. His GAF score was 40. R. 432.

On January 3, 2008, Robinson reported having suicidal thoughts on and off. ARNP Emerson observed that he had a depressed mood and blunted affect with limited insight and judgment. He had a GAF score of 40. ARNP Emerson instructed him to return to his previous medication. R. 428.

---

[8] Emerson's signature on this questionnaire reflects that she is an ARNP. Someone printed her name and added ARNP and Ph.D. R. 395. Subsequently, however, Emerson continued to sign her name solely as an ARNP. *See, e.g.,* R. 425. It appears, therefore, that she is not a psychologist.

Robinson reported that he went to an emergency room for observation of severe depression later in January 2008. When ARNP Emerson saw him on January 29, 2008, he reported that he was "'not too bad.'" R. 425. His attention, concentration, and memory were fair and his insight and judgment poor. His GAF score was 40. *Id.*

On March 24, 2008, Robinson reported that he was "doing great" with his medication. R. 423. His GAF score was 44. *Id.* In May 2008, a professional at ACT rated Robinson's GAF score at 40. R. 422.

On February 21, 2008, Robinson sought emergency room treatment for chest pain. The conclusion was that he was dehydrated. He was given Ativan for anxiety. R. 397.

In a letter submitted to the Appeals Council, Robinson's mother wrote that after the ALJ issued his decision in this case, Robinson attempted to drink antifreeze. It appears from her note that Robinson was subsequently hospitalized in a psychiatric unit but those treatment records are not before the Court. R. 490. Robinson's mother also wrote that Robinson was unable to comprehend documents from the SSA. R. 492.

### C. Claimant's Testimony and Written Statements.

At the ALJ's hearing, Robinson testified that he could not sit or stand for more than twenty minutes before needing to move due to lower back pain. R. 524-26, 538. He could only walk a couple of blocks due to back pain. R. 526. He used a hot tub and performed exercises to help alleviate that pain. R. 525. He had no residual problems from Lyme's disease. R. 536.

Robinson estimated that he could lift twenty pounds with his arms. R. 526. He tried to avoid bending. R. 527. He could not kneel or crouch because his knees would give out. R. 527. He could care for his personal hygiene, although he could not bend down to put on his shoes. R. 530.

He had side effects from his medication. Seroquel made him sleepy. He would pass out if he stood up too fast due to his blood pressure medicine. Zoloft made him nauseous. R. 528-29. He indicated that the medication kept him stable. R. 529.[9]

He lived with his parents, who performed household chores. R. 527. He could only go into a store for short periods due to anxiety. R. 527-28. He described two panic attacks in which his heart started racing and he began shaking. R. 532. He could sometimes to go a movie or a fast food restaurant by himself. R. 539. He could talk and play games with people he knows. R. 87.

Quite often he had days when he was feeling down and stayed in bed all day. R. 533. He had problems with short-term memory. He would forget tasks unless written down. R. 533-34. He indicated that he could not be relied upon. R. 535.

He could concentrate to read a good book but he often had to stop working on puzzles and return to the task later. R. 534. He could pay attention during a movie shifting his position in the chair. R. 540. He was able to use a computer for browsing. R. 538.

D.     *Vocational Expert Testimony.*

The ALJ asked the VE to assume the following hypothetical individual:

> Assume an individual of 44 years old with a work background and education as testified to by the claimant. I want you to assume that the individual can sit up to six hours per day, up to one hour at a time and at least once per hour a day would have the freedom to stand up and loosen up for one or two minutes. I want you to assume that the individual can stand or walk up to four hours in a day, up to 30 minutes at a time; lift up to 20 pounds occasionally, 10 pounds frequently; occasional bending, stooping; no crawling; occasional stairs; no ladders, ropes or scaffolds; occasional crouching; occasional kneeling; occasional reaching above shoulder level; cannot work around

---

[9] Robinson's attorney submitted to the Appeals Counsel papers showing the possible side effects of various medication. R. 497-516. Robinson prepared a list of side effects of medication which was submitted to the Appeals Council. R. 517.

> unprotected heights[;] no work around moving and hazardous
> machinery; no use of foot controls.  I want you to assume that the work
> would need to be single, unskilled, repetitive, low stress, and done
> primarily alone with contact with the general public or supervisors . . .
> should be brief and superficial.

R. 541-42.  The VE testified that this hypothetical individual could not perform Robinson's past

relevant work.  However, the individual could perform the following jobs:  mail clerk, unskilled, light

duty; photo finisher, unskilled, light duty; and, surveillance system monitor, unskilled, sedentary

duty.  R. 542.  With the added limitation of a moderate impairment in concentration, persistence and

pace, the VE opined that the individual could not perform the surveillance system monitor job.  R.

542-43.

Robinson's attorney asked the VE to assume the following hypothetical individual:

> [T]he same age, education, and work experience as the claimant.  This
> person, however, and just strictly on non-exertional limitations has no
> useful ability to function in completing a normal workday or workweek
> without interruptions from his psychologically based symptoms.  No
> useful ability to function accepting instructions and responding
> appropriately to criticism from superiors, and also would be unable to
> meet competitive standards in maintaining attention for a two hour
> segment, making simple work related decision, performing at a
> consistent pace without an unreasonable number and length of rest
> periods.

R. 543.  The VE opined that there would be no jobs this individual could perform.  R. 544.  The VE

further opined that an individual who would need to be absent from work more than four days a

month could not perform any available jobs.  *Id.*

The VE further testified that if the individual had to sit for twenty minutes followed by

standing for twenty minutes, that person could not perform the job of mail clerk, but he could perform

the jobs of photo finisher and surveillance system monitor.  R. 544.  The VE indicated that a person

with severe problems in concentration, persistence and pace could not perform the job of photo finisher. *Id.*

## V. ANALYSIS.

Robinson asserts four grounds supporting reversal. He argues that the ALJ erred by failing to state the weight he accorded to the opinions of ARNP Emerson and Dr. Deeb. He contends that the ALJ failed to develop the record regarding his compliance with medication and substitute his opinion for the medical experts' opinions. He submits that the ALJ's finding that his testimony was not completely credible is not supported by law or fact. Finally, he asserts that the Appeals Council erred in its consideration of new evidence submitted to it. These are the only issues I will address.[10]

### A. Weight Given to Opinions of ARNP Emerson and Dr. Deeb.

An ALJ must "state specifically the weight accorded to each item of evidence and why he reached that decision." *Cowart v. Schweiker*, 662 F.2d 731, 735 (11th Cir. 1981). With respect to treating physicians, the ALJ must give substantial or considerable weight to their opinions unless good cause is shown to the contrary. *See Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997). Good cause has been found where the treating physician's opinion was not bolstered by the evidence, was inconsistent with findings by other physicians or the treating physician's own records, or were merely conclusory. *Id.* (internal citations omitted). "The ALJ must clearly articulate the reasons for giving less weight to the opinion of a treating physician, and the failure to do so is reversible error." *Id.* Social Security Rule 06-03p extends the evaluation of opinions of medical sources to opinions from other sources, including an ARNP. SSR 06-03p, 2006 WL 2329939 (Aug. 9, 2006).

---

[10] The parties were advised that issues not specifically raised would be waived. Doc. No. 14 at 2.

Turning first to ARNP Emerson, the ALJ found her mental RFC assessment contained in the questionnaire prepared in November 2007 to be in direct conflict with the progress Robinson had made and the majority of the medical records. The ALJ also did not give any weight to the opinions that included GAF score of 40 to 45, many of which were assigned by ARNP Emerson.

In support of this determination, the ALJ compared ARNP Emerson's opinions with the other records of treatment and the opinions of the reviewing physicians. In sum, the ALJ noted that after the alleged disability onset date Dr. Graham, a consulting psychologist, found no indication of a depressed or anxious mood, and determined that Robinson had a GAF score of 70-75. During the same period, Dr. Wise, a reviewing physician, opined that Robinson had only mild limitations in functioning. Medical records of Robinson's treatment at ACT from November 2006 through June 2007 reflect that Robinson was stable while on his medication. In August 2007, Dr. Harris, another examining physician, found mild to moderate limitations in mental functional capacity. After ARNP Emerson rendered her November 2007 mental RFC assessment, records from ACT reflect that Robinson reported he was doing great.[11] R. 29-31. These facts, which are supported by record evidence, adequately state the reason that the ALJ did not credit ARNP Emerson's mental functional RFC assessment.

Robinson also asserts that the ALJ erred by failing to mention the opinion of Dr. Deeb. The only reference in the record to Dr. Deeb cited by Robinson is a one page form dated January 2009 – fourteen months after ARNP Emerson prepared the mental RFC questionnaire – concurring in ARNP Emerson's evaluation of Robinson's condition. There is no indication that Dr. Deeb examined or treated Robinson and no indication what Dr. Deeb relied upon in belatedly concurring with ARNP

---

[11] The ALJ misread the GAF score in this record as 66. The record notes a GAF score of 44. R. 423.

Emerson's assessment.  Under these circumstances, the ALJ did not err by failing to mention Dr. Deeb's opinion.

      B.     *Failure to Develop the Record Regarding Compliance with Medication.*

To be eligible for benefits, a SSA disability claimant must follow treatment prescribed by a physician, if the treatment can restore the claimant's ability to work.  20 C.F.R. §§ 404.1530, 416.930(a).  "In order to deny benefits on the ground of failure to follow prescribed treatment, an ALJ must make specific findings that the claimant would have the ability to work if the prescribed treatment had been followed."  *Mote v. Astrue*, Case No. CV507-068, 2009 WL 632711, at * 3 (S.D. Ga. 2009).

In the present case, the ALJ found that "[t]he overall evidence indicates that when compliant with medications and not manipulating medications, the claimant demonstrates the capability to function at a higher degree."  R. 33.  Robinson argues that this conclusion is not supported by the record because "[t]he record is replete with opinions that included assessments of GAFs lower than 45 at times when Mr. Robinson was compliant with his medications."  Doc. No. 15 at 16.  He also contends that the ALJ should have more fully developed the record, but he does not present additional evidence on the issue or even suggest what the ALJ could have done in light of the records presented to him.

Robinson cites eleven instances in which treating professionals assessed a GAF score of 40 to 45 after the disability onset date when he was compliant with his medication.  A GAF score is merely a 'snapshot' of the person's conditions on a given day.  *See, e.g., Easley v. Astrue*, No. CA 11-0072-C, 2011 WL 6102015, at * 7 (S.D. Ala. Dec. 8, 2011).  As such, a GAF score is not indicative of Robinson's overall level of functioning after the alleged disability onset date.  Furthermore, many of the record citations relied on by Robinson reflect circumstances other than compliance with

medication that altered his functional ability: October 16, 2007 – angry because not first patient seen (R. 435); November 1, 2007 – best friend died (R. 434); November 15, 2007 – best friend died and dumped by his girlfriend (R. 433); January 29, 2008 – girlfriend broke up with him (R. 425-26).

Rather than focusing solely on GAF scores, the ALJ considered the record as a whole. The ALJ noted the evidence of record that Robinson was not always compliant with his medication and sometimes adjusted his medication on his own. *See, e.g.,* R. 380, 421, 428, 436. The ALJ noted that, after the alleged disability onset date, Dr. Graham found that Robinson had no significant mental functional limitations. R. 294-96. Robinson himself reported that he was stable and not so irritable while taking his medication. R. 322, 331, 423, 529. In contrast, Robinson reporting having depression when he needed refills of or had self-adjusted his medicine. R. 380-81, 436. Moreover, at least one physician found Robinson's condition stable even when he was not taking his medication. R. 261.

The ALJ made specific findings based on evidence in the record that when compliant with medication, Robinson was able to function day-to-day with mild to moderate limitations in mental functional capacity. R. 32. These findings are supported by substantial evidence in the record. Accordingly, this assignment of error is unavailing.

C.    *Credibility.*

The ALJ found that Robinson's "statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment." R. 32. Robinson contends that the ALJ failed to articulate explicit and adequate reasons supporting this finding, citing *Foote v. Chater*, 67 F.3d 1553, 1561 (11th Cir. 1995), and other cases.

Contrary to Robinson's argument, the ALJ did not rely merely on his noncompliance with medication to support the credibility finding. The ALJ also noted that Robinson was friendly with others he knows and able to play cards, browse using a computer and go to the pool, sauna, a fast food restaurant and to the movies. R. 24, 27, 29. There is substantial evidence in the record supporting these findings. *See, e.g.,* R. 87, 295, 336, 539. Having stated explicit and adequate reasons supported by substantial evidence for finding Robinson's statements not entirely credible, the ALJ did not err in his credibility finding.

     D.     *Appeals Council.*

Robinson argues that the Appeals Council erred by failing to find that the pharmacy information sheets, *Physician's Desk Reference Pages* and a handwritten sheet of side effects of medication warranted review of the ALJ's decision by the Appeals Council. When the Appeals Council denies review based on new evidence, "a reviewing court must consider whether that new evidence renders the denial of benefits erroneous." *Ingram v. Comm'r of Soc. Sec. Admin.*, 496 F.3d 1253, 1262 (11th Cir. 2007).

The ALJ inquired regarding side effects of medication. R. 528-29. Robinson reported only feeling like he would pass out if he stood up too quickly, sleepiness, difficulty having sex and nausea. R. 528-29. The ALJ established through Robinson's testimony that despite these side effects Robinson could concentrate sufficiently to read a good book and to sit through a two-hour movie and engage in other activities of daily living.

The Appeals Council stated in its decision that it considered the newly presented evidence. The pharmacy information sheets and PDR reference showed only possible symptoms from the medications, not that Robinson experienced additional side effects. *See, e.g., Walker v. Comm'r of Soc. Sec.*, 404 F. App'x 362, 366 (11th Cir. 2010) (unpublished decision cited as persuasive

authority).  The handwritten sheet reflects alleged side effects that Robinson did not disclose to the

ALJ in response to questioning.  Robinson does not cite to evidence in the record showing that he

complained of each of these newly disclosed side effects.  As such, the new evidence did not

contradict the ALJ's finding of Robinson's testimony as to the severity of his impairments.

Accordingly, the Appeals Council did not err in its consideration of the new evidence.

## VI.     RECOMMENDATION.

For the reasons set forth herein, it is **RESPECTFULLY RECOMMENDED** that the

decision of the Commissioner be **AFFIRMED**.  It is further recommended that the Court

**DIRECT** the Clerk of Court to issue a judgment consistent with its Order on this Report and

Recommendation and, thereafter, to close the file.

Failure to file written objections to the proposed findings and recommendations contained

in this report within fourteen (14) days from the date of its filing shall bar an aggrieved party from

attacking the factual findings on appeal.

**RESPECTFULLY RECOMMENDED** this 23d day of January, 2012.

*Karla R. Spaulding*

KARLA R. SPAULDING
UNITED STATES MAGISTRATE JUDGE